IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JANE DOE<br><br>Plaintiff,<br><br>v.<br><br>THE OFFICE OF REPRESENTATIVE SHEILA JACKSON LEE<br><br>   Serve:<br>   Representative<br>   Sheila Jackson Lee<br>   2187 Rayburn HOB<br>   Washington, DC 20515<br><br>AND<br><br>CONGRESSIONAL BLACK CAUCUS FOUNDATION<br><br>   Serve:<br>   John M. Remy<br>   Jackson Lewis P.C.<br>   10701 Parkridge Blvd.<br>   Suite 300<br>   Reston, VA 20191<br><br>Defendants. | Civil Action No. _____<br><br><br><br><br><br>Jury Demand |

## COMPLAINT AND JURY DEMAND

### Preliminary Statement

1.    This is a civil action against Defendants, The Office of Representative Sheila Jackson Lee and the Congressional Black Caucus Foundation (CBCF), for compensatory and

1

punitive damages exceeding $75,000 for injuries Plaintiff Jane Doe has sustained as a result of the Office of Representative Sheila Jackson Lee's unlawful termination of Ms. Doe's employment and CBCF's unlawful retaliation against Ms. Doe, its intentional interference with Ms. Doe's employment, and for intentionally inflicting emotional distress on Ms. Doe.

2. Ms. Doe worked as a CBCF intern in the Fall of 2015, and as Special Assistant and Director of Public Engagement for The Office of Representative Sheila Jackson Lee from November of 2017 – March of 2018. The Office of Representative Sheila Jackson Lee and CBCF (for which Representative Jackson Lee serves as the Board Chair) unlawfully retaliated against Ms. Doe after Ms. Doe threatened to sue the CBCF because another CBCF employee (Damien Jones) raped Ms. Doe while he was Ms. Doe's supervisor.

## Jurisdiction and Venue

3. The Court has subject matter jurisdiction over this case under 28 U.S.C. § § 1331, 1332, and 1367, and 2 U.S.C. § 1408.

4. Venue is proper under 28 U.S.C. § 1391(b)(1)-(2) because the Defendants' principal place of business is in this judicial district, and the events giving rise to Plaintiff's claims took place in this district.

## Parties

5. Plaintiff Jane Doe is a citizen of the United States and a citizen of the State of Alabama. Her name and full address are being filed separately under seal.

6. Defendant The Office of Representative Sheila Jackson Lee is a Congressional Office located in Washington, D.C.

7. Defendant the Congressional Black Caucus Foundation is a nonprofit corporation incorporated under the laws of the District of Columbia with its principal place of business

located at 1720 Massachusetts Ave., N.W., Washington, D.C. 20036.

**Factual Allegations**

8. In August 2015, while an undergraduate student at Howard University, Ms. Doe began working as an intern in the CBCF internship program. The program assigns students from around the country to work in congressional offices. Ms. Doe was assigned to the office of Representative Terri Sewell.

9. Ms. Doe had specifically attended Howard University to study politics and communication. She selected Howard because of its reputation and its location in Washington, D.C. Ms. Doe accepted the position in the CBCF program because she believed it would assist her in pursuing a career in politics or government relations, based on the program's prestigious reputation of preparing college students for a career in politics.

10. Ms. Doe was supervised by Mr. Damien Jones, the CBCF Internship Program Coordinator who supervised all CBCF interns.

11. In October 2015, Mr. Jones was 30 years old. Ms. Doe was 19 years old.

12. On October 24, 2015, the CBCF required all interns, including Ms. Doe, to participate in a fundraiser taping at CBCF headquarters. Mr. Jones instructed Ms. Doe to wait alone on a separate floor of CBCF headquarters while the other interns completed their taping, so that Ms. Doe completed her segment of the taping last. All other interns had left the building by the time Ms. Doe was finished.

13. After she completed her taping, Mr. Jones invited Ms. Doe to get dinner with him. Ms. Doe agreed, and the two went to a nearby restaurant, Lauriol Plaza. At the restaurant, Mr. Jones immediately ordered a margarita for each of them, as well as a pitcher of margaritas to share. While sitting at the table, Mr. Jones told Ms. Doe to write him a text message. This was

an odd request as the two had previously exchanged text messages, and they were sitting at the table together. Nevertheless, Ms. Doe did so, writing him "Hey." After dinner, Mr. Jones ordered an Uber car to take them to his house. They first stopped at a liquor store where Mr. Jones purchased alcohol, and then had the Uber driver drive them to his house. At Mr. Jones' house, Mr. Jones poured drinks for himself and Ms. Doe. Ms. Doe told Mr. Jones that she could not drink anymore, and that she needed to leave.

14. Ms. Doe can only partially recall the subsequent events that evening because of the large quantity of alcohol Mr. Jones had given her at the restaurant and/or because he drugged her at some point that night.

15. Ms. Doe remembers that Mr. Jones brought out a container with marijuana and a pipe. He asked her if she smoked, and she said no. He ignored her, lit the pipe, and put it in her mouth so that she would smoke it.

16. At one point that evening, Ms. Doe texted her friend Victoria Gray, stating: "Help," "I'm want t [sic] to go home," and "I'm ready to cry." Ms. Gray responded and asked where Ms. Doe was. Ms. Doe replied that she did not know, and "I need you" and "No joke." Ms. Gray asked Ms. Doe again where she was, and to send her "pin" location via text so that Ms. Gray could send a car to pick her up. Ms. Doe attempted to do so, but her phone was unable to send Ms. Gray the specific address. Ms. Doe then sent a number of messages that are indiscernible, mostly just jumbles of letters. Ms. Gray asked who she was with, and Ms. Doe replied that she was with her "[intern] coordinator." Ms. Gray told Ms. Doe to have that person call her. Ms. Doe responded "[I don't know] how" and "Help." Ms. Gray then asked again for the address so that she could send a car for Ms. Doe, but Ms. Doe stopped responding to her text messages.

17. Eventually, Ms. Doe stopped texting Ms. Gray, because, upon information and belief, Mr. Jones took her phone from her while she was intoxicated so that she could no longer call for help.

18. Ms. Doe remembers Mr. Jones kissing her and putting his finger in her vagina. She also remembers him on top of her on the couch. She remembers thinking, and possibly saying aloud: "I'm not having sex, I just can't do this." At some point, Mr. Jones forced his penis into her mouth and made Ms. Doe perform oral sex on him. She also remembers being naked in Mr. Jones' shower and asking him, "why am I in the shower?"

19. Ms. Doe also remembers Mr. Jones' roommate being in the hallway while Mr. Jones assaulted her. She had met his roommate before, but does not know his name. Ms. Doe remembers throwing up at some point.

20. Ms. Doe at no point consented to Mr. Jones touching her private areas, to performing oral sex or to engage in any other sexual contact, or to him removing her clothes.

21. Ms. Doe woke up the next morning, October 25, 2015, naked in Mr. Jones' bed, with his arms and legs around her, and without her phone. She dressed (but could not find her underwear), found her phone in a different room, and left.

22. Ms. Doe left Mr. Jones' house and contacted a group of friends to tell them about what she could remember from the night before. Throughout the day she had pain in her vagina, hip, neck, and mouth, had pain when urinating, and was nauseous.

23. Later in the day Ms. Doe sent a text message to Mr. Jones asking him, "I was really drunk last night what happened?" He responded, "Nothing. You threw up everywhere. That's it." She replied, "So how did I end up with no clothes on in your bed this morning?" He responded, "Call me."

24. Ms. Doe spoke with Mr. Jones by telephone that same day, and recorded their conversation with two witnesses listening to the conversation on speakerphone. Mr. Jones admitted that they kissed and that he took off her clothes and put her in the shower. Mr. Jones denied they had sex, but he remained evasive, and asked her throughout the telephone call what she remembered and whether his version of events sounded accurate to her.

25. Also that day, Ms. Doe went to the hospital where a Sexual Assault Nurse Examiner administered an exam. The examiner noted swelling and redness in Ms. Doe's pelvic area, swelling on her lower back, and that one of her finger nails was broken. The examiner also noted blood and a "yellow stringy discharge" coming from Ms. Doe's cervix and vagina. The examiner took Ms. Doe's pants as evidence, gave her medication, conducted a toxicology test, and swabbed several areas of Ms. Doe's body.

26. The following Monday, Ms. Doe called into work sick. She remained out of work for several days, and spent most of her time in her bed for the three days following the attack. She initially told Shashrina Thomas (then-Chief of Staff for Representative Sewell and previously Deputy Chief of Staff for Representative Jackson Lee) that she would be out of work because she was dealing with a personal issue. Ms. Thomas probed her for more information. Eventually, Ms. Doe told Ms. Thomas that she had an incident with Mr. Jones, but did not offer specifics. Ms. Thomas said she would have to tell Representative Sewell, which, upon information and belief, she did.

27. On October 30, 2015, Ms. Doe spoke with Representative Sewell over the phone. Ms. Doe told Representative Sewell the entire story based on what she could remember, including that Mr. Jones raped her. Representative Sewell asked, "Are you sure?" and told Ms. Doe, "That's a very serious accusation." Representative Sewell also told her that she had to tell

Ms. Doe's mother (who is a professional acquaintance and distant relative of Representative Sewell). Later that day, Representative Sewell, without Ms. Doe's permission, called Ms. Doe's mother and told her that something had happened and that she (Ms. Doe's mother) needed to speak with Ms. Doe.

28. During the first week of November 2015, Ms. Doe met with representatives from CBCF. They asked for the communications she had with Mr. Jones, including emails, text messages, and the recorded call. They told Ms. Doe that they were placing Mr. Jones on leave immediately.

29. Ms. Doe reported the assault to the Metropolitan Police Department, and the police began an investigation. A forensic investigation found sperm on the pants Ms. Doe was wearing the night of October 24, 2015; however, investigators were unable to retrieve a sufficient DNA profile from the sperm. Mr. Jones's DNA was found on Ms. Doe's breast (the investigators had obtained a search warrant to collect a DNA sample from Mr. Jones for this analysis), and Mr. Jones "cannot be excluded" as a contributor to DNA found on Ms. Doe's neck. Another man's DNA was found on Ms. Doe's pants—possibly Mr. Jones's roommate, whose DNA was never compared to the sample.

30. In October of 2016, Ms. Doe, through her former counsel, notified CBCF that she intended to pursue legal action against CBCF. She met with CBCF representatives and attorneys, but ultimately did not pursue a lawsuit.

31. In October 2016, A. Shuanise Washington served as CEO of the CBCF and Representative Sheila Jackson Lee served as the Vice Chair of the Board of Directors of CBCF.

32. In April 2017 Representative Jackson Lee was appointed Chair of the Board of Directors of CBCF.

33. Ms. Doe graduated from Howard University in May, 2017. She then moved to New York City, where she worked for several months.

34. In the Fall of 2017, Ms. Doe planned to move back to Washington, D.C. On October 19, 2017 at a networking event held at the MGM National Harbor Hotel and Casino, Ms. Thomas introduced Ms. Doe to Glenn Rushing, the Chief of Staff for Ms. Thomas's former employer, Representative Jackson Lee.

35. Ms. Doe subsequently formally interviewed with Mr. Rushing for a position in Representative Jackson Lee's office. Ms. Doe thereafter had a second interview with both Mr. Rushing and Representative Jackson Lee. During the second interview, Mr. Rushing mentioned that, at times, staff members were asked to drive Representative Jackson Lee, and asked Ms. Doe if she had a car that she could use to drive Representative Jackson Lee from time to time. Mr. Rushing was primarily responsible for driving Representative Jackson Lee to and from events, and to and from her home and office. However, Mr. Rushing asked Ms. Doe if she would be able to drive Representative Jackson Lee at times when he was out of town or otherwise unavailable. Ms. Doe said she did own a car, and agreed to drive Representative Jackson Lee as necessary.

36. Mr. Rushing subsequently offered Ms. Doe a position with Representative Jackson Lee as Special Assistant and Director of Public Engagement. Ms. Doe accepted the position.

37. On her first day in Representative Jackson Lee's office, Ms. Doe learned that Mr. Jones had expressed interest in a job with Representative Jackson Lee. Just two months earlier, CBCF invited Mr. Jones to appear on a panel at CBCF's Annual Legislative Conference, even though the CBCF knew that he had sexually assaulted Ms. Doe.

38. After she learned that Mr. Jones may begin working in Representative Jackson Lee's office, Ms. Doe told Mr. Rushing that she had a "prior situation" with Mr. Jones and was not comfortable working with him. Mr. Rushing responded that he understood, and that he decided not to hire Mr. Jones because he had a situation with CBCF and they could not have him working in the office as a result.

39. As Representative Jackson Lee's Special Assistant, Ms. Doe was responsible for setting Representative Jackson Lee's passwords, storing them, and using them in the office when necessary. Ms. Doe was also required to charge and manage Representative Jackson Lee's electronic devices, including her personal cell phone. Ms. Doe was also asked to write emails on Representative Jackson Lee's behalf.

40. Ms. Doe's other duties included serving as the office's intern supervisor, office manager, and social media coordinator. She also wrote draft policy statements for Representative Jackson Lee. She assisted with hiring and recruiting office staff, specifically assisting to recruit and hire a technology staffer for the office.

41. Mr. Rushing trusted Ms. Doe to make decisions for the office. He referred to her by the nickname "Dep," as in she was his Deputy in the office.

42. At all times during Ms. Doe's employment, Representative Jackson Lee served as the Chair of the Board of Directors of CBCF. Representative Jackson Lee instructed Ms. Doe to do extensive work for the CBCF while she worked in Representative Jackson Lee's Congressional Office. This work included helping to organize CBCF initiatives and events, and drafting and sending letters and emails promoting CBCF events and fundraising efforts. Specifically, Ms. Doe worked on an CBCF Economic Summit that Representative Jackson Lee organized; a study abroad program that sent CBCF interns to China; an internship program

involving the NFLPA; a CBCF retreat in New York City in December of 2018; and attended various other CBCF events. Whenever anyone sent an email to Representative Jackson Lee regarding the CBCF, the email was forwarded to Ms. Doe for action.

43.     Upon information and belief the CBCF knew that Representative Jackson Lee routinely used her Congressional staff to do work on behalf of CBCF.

44.     Between November 2017 and January 2018, Ms. Doe used her personal vehicle to drive Representative Jackson Lee on several occasions without any compensation for gas or the additional mileage placed on her vehicle. However, Ms. Doe was not Representative Jackson Lee's primary driver. Mr. Rushing continued to serve as Representative Jackson Lee's primary driver when he was available. Other staff members also drove Representative Jackson Lee during that time period, including her Scheduler, LaDedra Drummond, and another staff member, Lilly Coney.

45.     On one day in November 2017, shortly after she began working in the office, Ms. Doe was serving as Representative Jackson Lee's driver, and was waiting for Representative Jackson Lee to finish an event so that she could drive her back to her office. On this particular day, Representative Jackson Lee's cell phone had been malfunctioning and Representative Jackson Lee asked Ms. Doe to work with the IT team to ensure that the phone maintained its charge and that her emails continued to come through. Representative Jackson Lee instructed Ms. Doe to back up her cell phone and reset it in an effort to resolve the issue. Ms. Doe charged Representative Jackson Lee's cell phone, as instructed, and waited for it to reset. During this process, a text message appeared from the then-CEO of the CBCF, A. Shuanise Washington, to Representative Jackson Lee, which read something to the effect of: "I just received a notification that you [Representative Jackson Lee] have a new staffer, [Jane Doe's name]. Call me, I have

background on her."

46. Ms. Doe was obviously shocked by the message, which was a clear reference to the fact that Ms. Doe had asserted legal claims against CBCF and the fact that Mr. Jones had raped Ms. Doe.

47. Ms. Doe contacted Ms. Thomas, with whom Ms. Doe was living at the time. Ms. Doe told Ms. Thomas about Ms. Washington's statement, although she told Ms. Thomas that she heard about the comments from a third party, so as to avoid the appearance that she was reading messages on Representative Jackson Lee's phone. Ms. Thomas responded that she did not believe Ms. Washington would say anything like that. Ms. Thomas also stated that around October 2016, CBCF staff told her in her capacity as Chief of Staff for Representative Sewell that Ms. Doe's matter was "over" and neither Ms. Thomas nor Representative Sewell's office needed to worry about the issue or Ms. Doe's claims. This led Ms. Thomas to conclude that Ms. Doe had reached a financial settlement with CBCF in 2016. Ms. Doe told Ms. Thomas that she never reached any settlement with CBCF.

48. In January 2018, Ms. Doe was involved in an accident on her way to pick up Representative Jackson Lee. Ms. Doe was injured in the accident and her car became unsafe to drive. She stored her car in the garage used by House employees. Shortly after the accident, Ms. Doe was working late in the office. Representative Jackson Lee told Ms. Doe that Ms. Doe must use her car to drive her home. Ms. Doe replied that her car was unsafe to drive following the accident as, among other things, the car's lights were not functioning properly. However, Representative Jackson Lee insisted that Ms. Doe drive her home. Ms. Doe, concerned about her job, agreed and drove Representative Jackson Lee to her home.

49. In the weeks following the accident, Mr. Rushing and Representative Jackson Lee

11

both pressured Ms. Doe to buy a new car so that she could continue to drive Representative Jackson Lee as needed. Specifically, Representative Jackson Lee told Ms. Doe that she should purchase an SUV, because that would be higher off the ground and more comfortable for Representative Jackson Lee. Ms. Doe told Representative Jackson Lee and Mr. Rushing that she was searching for a new vehicle but was having difficulty finding one that she could afford and for which she would be approved for financing. Although both told Ms. Doe that she should purchase a new car, neither Mr. Rushing nor Representative Jackson Lee ever told Ms. Doe that purchasing a car was a prerequisite to continued employment.

50. Mr. Rushing had previously charged rental cars to the Office for staff, but refused to authorize a rental car for Ms. Doe. However, Ms. Doe continued to travel to the airport to pick up Representative Jackson Lee with Mr. Rushing. When Representative Jackson Lee's flights arrived, Mr. Rushing would drive her back to the office while Ms. Doe waited for her bags and then took an Uber or Lyft to the office alone because Representative Jackson Lee did not want to wait for her bags.

51. In late February, 2018, Ms. Doe selected a car to purchase (a 2018 Toyota Rave 4) however the dealership that she was purchasing the car from did not have the specific make and model that she wanted in stock, and so it would have to special order the car. She told Mr. Rushing about the car and showed him a printout summary of the car that she intended to purchase.

52. The week after she decided to purchase the car, the bank notified Ms. Doe that it denied her loan application. Therefore, Ms. Doe could no longer purchase that car and had to find a different car to purchase.

53. On or about March 9, 2018, Ms. Doe told Mr. Rushing that she recently learned

12

more about her case involving Mr. Jones and CBCF, and planned to move forward with legal action against the CBCF. Mr. Rushing said he understood, and that he supported her because his daughter had been in a similar situation and chose not to move forward. Ms. Doe also told Mr. Rushing that she wanted to speak with Representative Jackson Lee about the issue. Mr. Rushing agreed and stated that he would arrange a meeting between Ms. Doe and Representative Jackson Lee for March 13, 2018.

54. Mr. Rushing did not arrange a meeting on March 13 between Ms. Doe and Representative Jackson Lee, or in the following weeks. Ms. Doe continued to ask Mr. Rushing to arrange a meeting but he repeatedly said that Representative Jackson Lee was unavailable. Ms. Doe also personally asked Representative Jackson Lee if the two could meet privately, but Representative Jackson Lee refused.

55. Prior to Ms. Doe telling Mr. Rushing that she was moving forward with legal action, Mr. Rushing and Representative Jackson Lee both stated on several occasions that they were pleased with Ms. Doe's performance.

56. On March 13, 2018 Ms. Doe purchased a new car (a 2016 Volkswagen SUV). She purchased the car from a dealer in Florida and made arrangements to have the car shipped to her home state of Alabama. Ms. Doe told Mr. Rushing that she purchased the car and that she planned to go to Alabama and bring the car back to Washington, D.C. so that she could continue to drive Representative Jackson Lee, as necessary. However, because Congress was in session at the time, Ms. Doe planned to wait until the end of the month when Congress was on Easter recess to travel to Alabama to pick up the car.

57. On March 29, 2018, Ms. Doe planned to travel to Alabama to pick up the car she had purchased and bring it back to Washington, D.C. Before she left the office that day, she

told Mr. Rushing she was heading to the airport. Mr. Rushing told her to wait, and asked her to come to a meeting with himself and Greg Berry, Representative Jackson Lee's Chief Counsel. The three met and Mr. Rushing told Ms. Doe that the Office was terminating her because of budgetary issues. Mr. Rushing and Mr. Berry said that because she was the last person hired by the office, she was the first to be let go. Mr. Rushing also stated that "It didn't help that you lied about the car."

58. Mr. Rushing and Mr. Berry's statement that Ms. Doe was the last person hired by the office was false. At least two persons were hired after Ms. Doe joined the staff before the Office terminated her, a new District Director and the Communications Director. Neither was terminated. These employees made at least the same salary that Ms. Doe made when she was terminated. There was also at least two people hired shortly after Ms. Doe was terminated, an IT staffer and a Finance Director. Representative Jackson Lee also gave another staffer a raise after firing Ms. Doe. In addition, Mr. Rushing had been soliciting applications for two other vacant positions since Fall, 2017—for a Staff Assistant and a Scheduler. After Ms. Doe's termination when she visited the office to return to return her badge, Mr. Rushing asked Ms. Doe whether she thought one of the current interns (whom Ms. Doe knew) would be a good fit for the scheduler position. He did not offer the position to Ms. Doe or suggest that she apply, even though she was qualified for the position.

59. Following March 29, 2018, the Office asked Ms. Doe to do further work for the Office, even though it had terminated her. This included answering emails and explain to Office staff various Office policies and procedures that Ms. Doe was responsible for. Ms. Doe asked Mr. Rushing for further clarification on why she was fired. He refused to respond to specific requests as to why she was terminated.

60. Ms. Doe has suffered severe emotional distress as a result of the CBCF and Representative Jackson Lee's actions. Since the attack in 2015, Ms. Doe has experienced extreme anxiety and depression. She has lost approximately fifty pounds and cut her hair to appear less attractive, in an attempt to be less sexualized by men and to avoid men approaching her. She does not like being alone, and particularly refuses to be alone with men. She no longer dates, and avoids going out at night.

61. Ms. Doe began mental health treatment in 2016, first with a trauma psychologist and then a psychiatrist. She was diagnosed with Post Traumatic Stress Disorder and prescribed medication. She subsequently had to discontinue treatment and medication for financial reasons.

62. After she was fired by Representative Jackson Lee, Ms. Doe's anxiety and depression increased. Knowing that she was fired because she reported the rape in 2015 triggered her past symptoms, and forced her to again confront the traumatic event. Further, the termination meant she lost her salary and health insurance, which prevented her from accessing necessary therapy.

63. Ms. Doe also lost wages after Representative Jackson Lee fired her, and was forced to move from Washington, D.C. back to her home state of Alabama to live with her mother while she searched for a new job.

64. Ms. Doe's career was derailed as a result of Representative Jackson Lee firing her. Ms. Doe has been interested in a career in politics since high school. She deliberately chose to come to Howard University because she wanted to study politics and be in the Washington, D.C. area. She majored in Strategic Management Communications, with a minor in Political Science. She hoped to someday work in government relations for a major company. The job with Representative Jackson Lee gave her great experience and exposure, as well as many

15

networking opportunities. It allowed her to work in Washington, D.C., which provides the most opportunities for advancement for young people working in politics. It is likely that, had she stayed working in Representative Jackson Lee's office longer, she would have built a resume and contacts list that would make her highly attractive candidate for other Capitol Hill jobs, jobs with private companies, and advocacy or lobbying groups. Now, Ms. Doe will essentially have to start at the beginning of her career again—once again building contacts and looking for a new job.

**Count I:**
**Violation of the Congressional Accountability Act, 2 U.S.C. § 1301 et seq.**
**by the Office of Representative Sheila Jackson Lee**

65.  Plaintiff hereby incorporates by reference each and every allegation contained in the above paragraphs.

66.  Ms. Doe was an employee of Representative Jackson Lee from November, 2017 until Representative Jackson Lee terminated her employment on March 29, 2018.

67.  Ms. Doe engaged in protected activity under 2 U.S.C. § 1311(a)(1) when she told Mr. Rushing that she could not work with Mr. Jones and that she intended to pursue legal claims against CBCF. Upon information and belief Mr. Rushing told Representative Jackson Lee that Ms. Doe planned to pursue claims against CBCF.

68.  The CBCF and the Office of Representative Jackson Lee conspired to retaliate against Ms. Doe because she threatened to file a lawsuit against CBCF. Representative Jackson Lee fired Ms. Doe in retaliation for asserting legal claims against CBCF.

69.  As a result of the retaliation Ms. Doe suffered lost wages and emotional distress damages, pursuant to 2 U.S.C. § 1311(b)(1).

**Count II:**
**Retaliation by the CBCF in Violation of the District of Columbia Human Rights**

## Act, D.C. Code § 2-1401.01 *et seq.*

70. Plaintiff hereby incorporates by reference each and every allegation contained in the above paragraphs.

71. Ms. Doe was sexually assaulted by Mr. Jones. Mr. Jones was a CBCF employee and Ms. Doe's supervisor at the time. Mr. Jones assaulted her following a work event that she was required to attend as part of her internship duties.

72. Ms. Doe reported the sexual harassment to CBCF employees and told those employees that she intended to pursue legal claims against CBCF related to the assault.

73. Ms. Doe told Mr. Rushing that she could not work with Mr. Jones because of a prior incident she had with him and that she intended to pursue legal claims resulting from the incident against the CBCF. Upon information and belief Mr. Rushing told Representative Jackson Lee that Ms. Doe planned to pursue claims against CBCF.

74. The CBCF and the Office of Representative Jackson Lee conspired to retaliate against Ms. Doe because she threatened to file a lawsuit against CBCF.

75. Ms. Washington, CEO of the CBCF, retaliated against Ms. Doe for asserting legal claims by telling Representative Jackson Lee that Ms. Doe had asserted legal claims against CBCF and by encouraging Representative Jackson Lee to fire Ms. Doe after she stated she planned to pursue her claims against the CBCF.

76. Representative Jackson Lee, Chair of the CBCF Board, terminated Ms. Doe's employment on March 29, 2018, after learning that Ms. Doe planned to move forward with a lawsuit against CBCF.

77. As a result of the retaliation Ms. Doe suffered lost wages and emotional distress damages, in excess of $75,000.

## Count III:
## Tortious Interference with Contractual Rights, Business Relationship, and With Prospective Economic Advantages by CBCF

78. Plaintiff hereby incorporates by reference each and every allegation contained in the above paragraphs.

79. Ms. Doe had a reasonable expectation of future employment with the Office of Representative Jackson Lee, where she was employed as Representative Jackson Lee's Special Assistant and Director of Public Engagement.

80. CBCF knew of Ms. Doe's employment relationship with the Office of Representative Jackson Lee, as evidenced by Ms. Washington's text message to Representative Jackson Lee in November 2017.

81. Ms. Washington disclosed Ms. Doe's legal claims against CBCF to Representative Jackson Lee with the intent to sever any ties between Representative Jackson Lee and Ms. Doe, and to prevent Ms. Doe from receiving future economic benefit from Representative Jackson Lee.

82. Upon information and belief, Ms. Washington encouraged Representative Jackson Lee to fire Ms. Doe in response to Ms. Doe telling Mr. Rushing that she was moving forward with legal claims against CBCF.

83. Representative Jackson Lee, who then served as the Chair of the Board of CBCF, terminated Ms. Doe in an effort to protect the CBCF from embarrassment and financial liability and only after Ms. Doe stated her intention to move forward with legal action against CBCF.

84. Ms. Doe suffered lost wages and emotional distress damages as a result of CBCF's interference with her contract rights in excess of $75,000.

## Count IV:
## Intentional Infliction of Emotional Distress by CBCF

85. Plaintiff hereby incorporates by reference each and every allegation contained in the above paragraphs.

86. CBCF encouraged Representative Jackson Lee to fire Ms. Doe, and Representative Jackson Lee did fire Ms. Doe, to inflict emotional distress on Ms. Doe so that she would not pursue her legal claims against CBCF.

87. CBCF's actions in encouraging Representative Jackson Lee to fire Ms. Doe because Ms. Doe raised legal claims after a CBCF employee raped her were outrageous and beyond all possible bounds of decency in a civilized community.

88. Ms. Doe suffered economic and emotional distress damages as a result of CBCF's intentional infliction of emotional distress, in excess of $75,000.

## Prayer for Relief

Wherefore, Plaintiff respectfully requests that the Court grant her the following relief:

1. Award Plaintiff compensatory and consequential damages against Defendants to address her economic and emotional injuries;

2. Award Plaintiff punitive damages for Defendants' reckless disregard of, and callous indifference to, her rights in an amount appropriate to the proof presented at trial;

3. Award Plaintiff her attorneys' fees and costs incurred in bringing this action; and

4. Grant such other relief as this court deems just and proper.

**Jury Demand**

Plaintiff demands a trial by jury on all claims so triable.

DATED: January 11, 2019

_____
Lynne Bernabei (D.C. Bar No. 938936)

_____
Alan Kabat (D.C. Bar No. 464258)

_____
Michael Ellement (D.C. Bar No. 1521035)
BERNABEI & KABAT, PLLC
1440 16th Street, N.W., Suite 500
Washington, D.C. 20036
Tel. (202) 745-1942
Fax (202) 745-2627
bernabei@bernabeipllc.com

*Attorneys for Plaintiff*