# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

JANE DOE,

        *Plaintiff*,

    v.

OFFICE OF REPRESENTATIVE SHEILA
JACKSON LEE, *et al.*,

        *Defendants.*

No. 19-cv-0085 (DLF)

## MEMORANDUM OPINION

Plaintiff Jane Doe brings this action against two of her former employers, The Office of Representative Sheila Jackson Lee (Jackson Lee's Office) and the Congressional Black Caucus Foundation (CBCF). Second Am. Compl. ¶ 1, Dkt. 36. Doe worked first as an intern for CBCF and later as a Special Assistant in Jackson Lee's Office. *Id.* ¶ 2. She alleges that during her time in Jackson Lee's Office, the defendants unlawfully retaliated against her after she threatened to sue CBCF because her supervisor allegedly raped her while they worked at CBCF in 2015. *Id.* ¶¶ 2, 12–21. Before the Court are Jackson Lee's Office's Motion to Dismiss the First Amended Complaint, Dkt. 24; CBCF's Motion to Dismiss the First Amended Complaint, Dkt. 23; and CBCF's Motion to Dismiss the Second Amended Complaint, Dkt. 40. For the reasons that follow, the Court will grant the defendants' motions.

## I.    BACKGROUND

According to the complaint, Doe began work as a 19-year-old in the CBCF Internship Program in August 2015. Second Am. Compl. ¶¶ 8, 11. There, CBCF's internship coordinator, Damien Jones, supervised her. *Id.* ¶ 10. On October 24, 2015, CBCF required all interns to

attend a fundraiser event at CBCF headquarters. *Id.* ¶ 12. Following the event, Jones invited Doe to dinner and purchased a margarita pitcher for the table. *Id.* ¶ 13. He then ordered an Uber to his house for both of them and offered Doe marijuana and more alcohol. *Id.* Doe can only partially recall the events that followed, but she claims that Jones raped her that evening. *Id.* ¶ 14–25. She reported this incident to Representative Terri Sewell, and CBCF placed Jones on leave immediately. *Id.* ¶¶ 27–28. Doe also reported the assault to the police, who began an investigation. *Id.* ¶ 29.

In October 2016, Doe notified CBCF that she intended to pursue legal action against the organization. *Id.* ¶ 30. At the time, A. Shuanise Washington served as CEO of CBCF and Representative Sheila Jackson Lee served as the Vice Chair of CBCF's Board of Directors. *Id.* ¶ 31. Doe met with CBCF representatives and attorneys about her allegations, but she ultimately chose not to pursue a lawsuit. *Id.* ¶ 30.

After Doe graduated from college, Jackson Lee's Office hired Doe as a Special Assistant and Director of Public Engagement in October 2017. *Id.* ¶¶ 33–36. On November 6—her first day working in the Office—Doe learned that Jones had expressed interest in a job with the Office as well. *Id.* ¶ 37. Doe then told Jackson Lee's Chief of Staff, Glenn Rushing, that she had a "prior situation" with Jones and was not comfortable working with him. *Id.* ¶ 38. Doe cannot recall whether it was then, or in a later March 2018 conversation, that she told Rushing that Jones had sexually assaulted her, *id.* ¶ 59, but "Mr. Rushing responded that he understood, and that he decided not to hire Mr. Jones because he had a situation with CBCF and they could not have him working in the office as a result," *id.* ¶ 38.

In the following months, Doe performed various tasks for Jackson Lee's Office. *See id.* ¶¶ 39–47. One of her duties was to occasionally use her personal vehicle to drive Jackson Lee to

various events. *Id.* ¶ 48. During one of these drives in November 2017, Jackson Lee's phone was malfunctioning, and Doe attempted to resolve the issue while the congresswoman attended an event. *Id.* ¶ 49. The IT team instructed Doe to charge, back up, and reset the phone. *Id.* According to Doe:

> During this process, a text message appeared from the then-CEO of CBCF, A. Shuanise Washington, to Representative Jackson Lee, which read something to the effect of: "I just received a notification that you [Representative Jackson Lee] have a new staffer, [Jane Doe's name]. Call me, I have background on her."

*Id.* Doe alleges that this "was a clear reference to the fact that Ms. Doe had asserted legal claims against CBCF and the fact that Mr. Jones had raped Ms. Doe." *Id.* ¶ 50. Doe does not allege that Jackson Lee ever saw or responded to this message. But a few weeks later, Washington and Jackson Lee served on a panel together at a CBCF event. *Id.* ¶ 52.

In January 2018, Doe was involved in an accident on her way to pick up Jackson Lee. *Id.* ¶ 53. Doe alleges that in the weeks following the accident, "Mr. Rushing and Representative Jackson Lee both pressured Ms. Doe to buy a new car so that she could continue to drive Representative Jackson Lee as needed." *Id.* ¶ 54. After Doe showed Rushing "a printout summary of the car that she intended to purchase" in late February, her bank denied her loan application. *Id.* ¶¶ 56–57. She was, however, able to purchase a different car on March 13, 2018, and the car was shipped to Doe's home state of Alabama. *Id.* ¶ 65. Doe then told Rushing that she "planned to go to Alabama and bring the car back to Washington, D.C. so that she could continue to drive Representative Jackson Lee," but she decided to "wait until the end of the month when Congress was on Easter recess" to pick up the car. *Id.* ¶ 65.

Just a few days earlier, on March 9, 2018, Doe had "told Mr. Rushing that she recently learned more about her case involving Mr. Jones and CBCF, and [she] planned to move forward with legal action against the CBCF." *Id.* ¶ 58. Rushing responded "during the March 9, 2018

conversation by saying that he understood, and that he supported Ms. Doe because his daughter had been in a similar situation and chose not to move forward." *Id.* ¶ 59. Doe then asked Rushing to schedule a meeting for her with Jackson Lee. *Id.* ¶ 60. He agreed to do so, but then "repeatedly said that Representative Jackson Lee was unavailable" over the next few weeks. *Id.* ¶¶ 60–61. "Doe also personally asked Representative Jackson Lee, but Representative Jackson Lee refused" and said "that the two would talk later." *Id.* ¶ 61. Doe alleges that after she reported to Rushing that she would be pursuing legal action, Jackson Lee "began avoiding Ms. Doe and speaking with her less frequently." *Id.* ¶ 63.

According to Doe, at a March 20, 2018 event, Jackson Lee "noticed Ms. Doe in the room," and then allegedly sent a text message to Rushing "saying something to the effect of, 'What is she doing here?'" *Id.* ¶ 66. Rushing, who was not at the event, then texted Doe and told her "that Representative Jackson Lee did not want her at the event and that she should leave." *Id.*

On March 29, 2018, Doe met with Rushing and Greg Berry, Jackson Lee's Chief Counsel. *Id.* ¶¶ 67–68. Rushing allegedly told Doe that the Office "was terminating her because of budgetary issues. Mr. Rushing and Mr. Berry said that because she was the last person hired by the office, she was the first to be let go. Mr. Rushing also stated that 'It didn't help that you lied about [her attempts to purchase] the car.'" *Id.* ¶ 68. Doe claims that Rushing's assertions are unfounded, and that the Office hired an IT staffer and a Finance Director after her termination. *Id.* ¶¶ 69–71. Rushing refused to respond to any of Doe's later questions as to why she was terminated and also hired another candidate to perform "substantially similar job duties to those that Ms. Doe completed." *Id.* ¶¶ 72, 74. Doe claims that "[k]nowing that she was fired because she reported the rape in 2015" has increased her anxiety and depression and further

alleges that termination by Jackson Lee's Office has "derailed" her career.  *Id.* ¶¶ 77, 79.

Doe brought suit against CBCF and Jackson Lee's Office on January 11, 2019.  Compl., Dkt. 3.  She first amended her complaint in April, alleging that: (1) Jackson Lee's Office violated the Congressional Accountability Act (CAA), 2 U.S.C. § 1301 *et seq.*, *see* First Am. Compl. ¶¶ 82–89, Dkt. 20; (2) CBCF violated the District of Columbia Human Rights Act (DCHRA), D.C. Code § 2-1401.01 *et seq.*, *see id.* ¶¶ 90–97; (3) CBCF tortiously interfered with Doe's contractual rights, business relationships, and prospective economic advantages, *see id.* ¶¶ 98–104; and (4) CBCF intentionally inflicted emotional distress against Doe, *see id.* ¶¶ 105–08.

CBCF and Jackson Lee's Office both moved to dismiss the claims against them in the First Amended Complaint.  *See* CBCF's Mot. to Dismiss First Am. Compl.; Office of Jackson Lee's Mot. to Dismiss First Am. Compl.  Doe then again amended her complaint to add a fifth claim, which alleged that CBCF also violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–3.  *See* Second Am. Compl. ¶¶ 109–17.  CBCF moved to dismiss the new count against it.  *See* CBCF's Mot. to Dismiss Second Am. Compl.

## II.     LEGAL STANDARD

Rule 12(b)(6) allows a defendant to move to dismiss the complaint for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6) motion, the complaint must contain factual matter sufficient to "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A facially plausible claim is one that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  This standard does not amount to a specific probability requirement, but it does require "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  A complaint need not contain "detailed

factual allegations," but alleging facts that are "merely consistent with a defendant's liability . . . stops short of the line between possibility and plausibility." *Id.* (internal quotation marks omitted).

Well-pleaded factual allegations are "entitled to [an] assumption of truth," *id.* at 679, and the court construes the complaint "in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged," *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (internal quotation marks omitted). But the assumption of truth does not apply to a "legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quotation marks omitted). An "unadorned, the defendant-unlawfully-harmed-me accusation" is not credited; likewise, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Ultimately, "[d]etermining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

## III. ANALYSIS

### A. The CAA Claims Against Jackson Lee's Office

The CAA "confers on 'covered employees' rights and remedies drawn from various labor and employment statutes not previously applicable to the legislative branch." *Fields v. Office of Johnson*, 459 F.3d 1, 4 (D.C. Cir. 2006) (citation omitted). As relevant here, the CAA's anti-retaliation provision prohibits an Office of a Member of the House of Representatives from retaliating against its employees because they have either opposed or participated in proceedings regarding "any practice made unlawful by [the CAA]." 2 U.S.C. § 1317(a); *see also id.* § 1301(a)(9)(A). One such unlawful practice is discrimination on the basis of sex. Specifically, the CAA provides that all "personnel actions affecting covered employees"—including

employees of the House of Representatives—"shall be made free from any discrimination based on . . . sex . . . within the meaning of section 703 of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-2)." 2 U.S.C. § 1311(a)(1); *see also id.* at § 1301(a)(3)(A). The CAA permits the recovery of damages from the personal office of a congressmember who violates the Act, *see Fields*, 459 F.3d at 8; *see* 2 U.S.C. § 1311(b); *id.* at § 1408(b), and thus represents a limited waiver of sovereign immunity, *see Oscarson v. Office of the Senate Sergeant at Arms*, 550 F.3d 1, 2 (D.C. Cir. 2008). As a "covered employee" under the CAA, *see* 2 U.S.C. § 1301(a)(3)(A), Doe urges two theories of liability—one of retaliation and one of sex-based discrimination.

1. *Retaliation*

The CAA's anti-retaliation provision states that:

"It shall be unlawful for an employing office to intimidate, take reprisal against, or otherwise discriminate against, any covered employee because the covered employee has opposed any practice made unlawful by this chapter, or because the covered employee has initiated proceedings, made a charge, or testified, assisted, or participated in any manner in a hearing or other proceeding under this chapter."

2 U.S.C. § 1317(a). "To state a claim for retaliation under the CAA, a plaintiff must show (1) that she engaged in statutorily protected activity; (2) that the defendant took an adverse employment action against her; and (3) a causal connection between the two." *Wigfall v. Office of Compliance*, 332 F. Supp. 3d 159, 174 (D.D.C. 2018).

Doe's retaliation claim fails because she did not engage in "protected activity" under the CAA. By its plain language, the anti-retaliation provision includes two clauses giving rise to "protected activity": the "opposition" clause, which protects a covered employee who has "opposed any practice made unlawful *by this chapter*," and the participation clause, which protects a covered employee who "has initiated proceedings, made a charge, or testified, assisted, or participated in any manner in a hearing or other proceeding *under this chapter*." *See Brady*,

200 F. Supp. 3d at 213; 2 U.S.C. § 1317(a) (emphases added).  Doe claims that she engaged in "protected activity" under the CAA on two occasions: first, when she notified CBCF that she intended to pursue legal action against it stemming from Jones's sexual assault, and second, when she told Rushing, Jackson Lee's Chief of Staff, that she was moving forward with proceedings against CBCF.  *See* Pl.'s Opp'n at 19–20, Dkt. 25.

Doe does not specify whether she brings her claim under the "opposition" clause or the "participation" clause, but her actions satisfy neither clause.  She appears to argue that her opposition to the alleged sex discrimination she endured while at CBCF counts as "protected activity" under the CAA. *See Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 968 (9th Cir. 2002) (Workplace sexual assault is "an act of discrimination based on sex.").  But Doe has not opposed any conduct "made unlawful by this chapter."  Only covered employers can engage in conduct "made unlawful by [the CAA]," and CBCF is not an employer covered by the CAA. *See* 2 U.S.C. § 1301.  Likewise, Doe's intention to initiate or participate in an action against CBCF does not give rise to a "proceeding under [the CAA]," because "protection under the participation clause only extends to complaints made to the Office of Compliance [OOC]" about conduct covered by the CAA.[1] *Brady*, 200 F. Supp. 3d at 216.  Doe has not initiated such a complaint.  Because Doe's actions do not fall within the plain text of the CAA's anti-retaliation clause, they are not "protected activity" under the Act.

Doe resists this conclusion, arguing that the CAA's anti-retaliation protections incorporate Title VII and that Title VII covers employees who engage in "protected activity"

---

[1] Congress recently renamed the Office of Compliance to the Office of Congressional Workplace Rights.  *See* 2 U.S.C. § 1381(a).  This change did not substantively impact the scope of the CAA's anti-retaliation provision.

against a former employer or third party. *See* Pl.'s Opp'n at 19–21 (citing *Flowers v. Columbia College Chicago*, 397 F.3d 532, 537 (7th Cir. 2005)). But the D.C. Circuit has made clear that the "this chapter" language of the CAA refers to the CAA—not to Title VII.[2] *See Iyoha v. Architect of the Capitol*, 927 F.3d 561, 566 (D.C. Cir. 2019) ("The CAA does not incorporate Title VII's provisions barring retaliation, but instead has its own provision with similar language."); *Fields*, 459 F.3d at 5 (noting that the CAA's anti-retaliation provision prohibits an employing office from taking action against an employee who "'has opposed' or reported 'any practice made unlawful' *by the [CAA]*" (emphasis added)). And the plain language of the CAA's anti-retaliation provision differs from Title VII's anti-retaliation provision. In contrast to the CAA, Title VII's anti-retaliatory provision prohibits retaliation against an employee "because he has opposed any practice made an unlawful employment practice by *this subchapter* [42 USCS §§ 2000e–2000e-17] . . . ." 42 U.S.C. § 2000e-3(a) (emphasis added). While other circuits have interpreted this language in Title VII to cover not only unlawful employment practices by a current employer, but also unlawful employment practices by former or third-party employers, these third-party employers were also *subject to Title VII. See Flowers v. Columbia Coll. Chi.*, 397 F.3d 532, 534 (7th Cir. 2005); *McMenemy v. City of Rochester*, 241 F.3d 279, 283 (2d Cir. 2001). As such, in these Title VII cases, the third-party employers still engaged in practices "made . . . unlawful . . . *this subchapter*" because those employers were also covered by Title VII. Unlike the third-party employers in the Title VII cases, CBCF is not an employer

---

[2] The CAA and Title VII also differ in other ways. For instance, under the CAA certain Congressional offices can consider party affiliation, domicile, and political compatibility in making employment decisions, while this exemption under Title VII is narrower. *See* 2 U.S.C. § 1432; 42 U.S.C. § 2000e-2(f). Also, Title VII only covers employers of a certain size, while the CAA removes this size limitation. *See* 42 U.S.C. § 2000e(b).

covered by the CAA, *see* 2 U.S.C. § 1301(a)(3), so its practices are not made unlawful by that statute.

The Court recognizes that this Court has applied Title VII's framework and case law to assess the merits of CAA-retaliation claims. *See, e.g.*, *Wigfall v. Office of Compliance*, 332 F. Supp. 3d 159, 167 (D.D.C. 2018). But what constitutes "statutorily protected activity" under each statute is different. And absent an "unequivocal expression" that Congress intended to waive the federal government's immunity from suit in this circumstance, the Court declines to interpret the CAA to do so here. *See Lane*, 518 U.S. at 192 ("A statute's legislative history cannot supply a waiver [of sovereign immunity] that does not appear clearly in any statutory text; 'the "unequivocal expression" of elimination of sovereign immunity that [courts] insist upon is an expression in statutory text.'") (citation omitted). Because Doe's actions do not constitute statutorily "protected activity" under the plain language of the CAA, the Court will dismiss her retaliation claim against Jackson Lee's Office.

2. *Sex Discrimination*

Doe also argues that Jackson Lee's Office discriminated against her on the basis of her sex. Unlike the CAA's distinct anti-retaliation provision, the CAA explicitly incorporates Title VII's prohibitions on sex-based discrimination. *See* 2 U.S.C. § 1311 ("All personnel actions affecting covered employees shall be made free from any discrimination based on . . . sex . . . within the meaning of [Title VII]."); *Turner v. U.S. Capitol Police*, 653 F. App'x 1, 2 (D.C. Cir. 2016). To prove a discrimination claim based on sex, a plaintiff "must show (1) that she is member of a protected class, (2) that she has suffered an adverse employment action, and (3) that the unfavorable action gives rise to an inference of discrimination." *Rhone v. U.S. Capitol Police*, 865 F. Supp. 2d 65, 69 (D.D.C. 2012). As in the Title-VII context, "[t]he critical issue"

in a sex-discrimination claim "is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 80 (1998) (internal quotation marks omitted).

Nothing in the complaint suggests that Jackson Lee's Office terminated Doe "*because she was a woman* raising sexual assault allegations" against CBCF.  *See* Pl.'s Opp'n at 28 (emphasis added).  Nor does the complaint allege facts indicating that Jackson Lee's Office would have treated a man in the same position any differently.  Instead, Doe argues in her opposition that an inference of discrimination exists because a "pernicious workplace stereotype about women survivors of sexual assault . . . is that they will become a distraction to other workers." *Id*. at 27.  To be sure, concrete instances of sex stereotyping by an employer "can certainly be evidence" that an employee's sex "played a part" in the employer's termination decision.  *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989) (plurality opinion) (emphasis omitted).  But a plaintiff alleging sex stereotyping still "must show that the employer actually relied on her gender in making its decision." *Id.* (emphasis added); *see also id.* at 272 (O'Connor, J., concurring).  Doe has failed to allege that anyone in Jackson Lee's Office held such a stereotype or believed that Doe would become a distraction to other workers because she was a female survivor of sexual assault.  *Cf. Doe v. Univ. of Mass. - Amherst*, Civil Action No. 14-30143-MGM, 2015 U.S. Dist. LEXIS 91995, at *27 (D. Mass. July 14, 2015) ("Plaintiff has not cited examples of any comments that targeted him based on his gender—as opposed to his status as a student accused of sexual assault—or any conduct suggestive of gender bias.").

Because Doe has failed to plausibly allege a claim of sex discrimination under the CAA, the Court will dismiss her discrimination claim against Jackson Lee's Office. [3]

## B.     The Statutory and Common Law Claims against CBCF

### 1.     *Title VII and DCHRA Retaliation Claims*

Doe also alleges that CBCF, her former employer, retaliated against her in violation of Title VII and the DCHRA.  Because "[t]he elements of a prima facie case for a DCHRA retaliation claim are the same as those under Title VII," *Martin v. District of Columbia*, 78 F. Supp. 3d 279, 315 (D.D.C. 2015), the Court will consider the two claims together.

To properly state a claim for retaliation under Title VII or the DCHRA, a plaintiff must allege: "(1) that [she] engaged in statutorily protected activity; (2) that [her] employer took adverse personnel action against [her]; and (3) that a causal connection exists between the protected activity and the adverse action."  *Grimes v. District of Columbia*, 89 A.3d 107, 112 (D.C. 2014); *see also Hamilton v. Geithner*, 666 F.3d 1344, 1357 (D.C. Cir. 2012) (reciting the same elements for a Title-VII retaliation claim).  "To survive [CBCF]'s motion to dismiss, [Doe's] complaint must 'contain sufficient factual matter, accepted as true,' to plausibly establish those three elements."  *Howard R.L. Cook & Tommy Shaw Found. for Black Emples. of the Library of Cong., Inc. v. Billington*, 737 F.3d 767, 772 (D.C. Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678).

---

[3] In a footnote in her opposition brief, Doe states that if the Court does not accept her sex-discrimination theory as is, she "seeks leave to amend her Complaint to clarify her theories of the Office's liability to include a gender discrimination claim."  Pl.'s Opp'n at 27 n.7.  "[C]ouching a motion to amend in a footnote in an opposition to a motion to dismiss is procedurally improper." *AHA v. Burwell*, 68 F. Supp. 3d 54, 63 (D.D.C. 2014).  Further, Doe has not filed a motion for leave to file a third amended complaint, and the Court has already granted Doe leave to amend her complaint on two occasions.  *See, e.g.*, *Ey v. Office of the Chief Admin. Officer*, 967 F. Supp. 2d 337, 341 n.4 (D.D.C. 2013); *Doe v. Kipp DC Supporting Corp.*, 373 F. Supp. 3d 1, 15 (D.D.C. 2019).  To the extent Doe seeks leave to amend her complaint a third time, it is denied.

Doe raises three theories of liability to support her retaliation claims against CBCF.  First, she alleges that CBCF itself "conspired" with Jackson Lee's Office "to retaliate against Ms. Doe because she threatened to file a lawsuit against CBCF."  Second Am. Compl. ¶ 94.  Second, Doe argues that Jackson Lee acted as CBCF's agent in terminating Doe, thereby rendering CBCF vicariously liable for Jackson Lee's actions.  *See* Pl.'s Opp'n at 37–38.  And third, Doe contends that Jackson Lee's Office and CBCF are joint employers.  *See id.* at 39–40.  The Court rejects each of these theories in turn.

i.      CBCF's Independent Liability

Doe's first theory fails because her complaint is devoid of facts that support her conclusory assertion that CBCF "conspired" with Jackson Lee's Office to retaliate against her. The only fact Doe offers in support of this assertion is a single November 2017 text from Washington, CBCF's CEO, to Representative Jackson Lee, stating that Washington "ha[d] background on [Doe]."  Second Am. Compl. ¶ 49.  This facially neutral text is too flimsy a reed upon which to support a conspiracy claim.  Doe fails to allege any "disparaging comments that were made or how [CBCF might have] spoke[n] ill of [her]."  *Niedermeier v. Office of Max S. Baucus*, 153 F. Supp. 2d 23, 31 (D.D.C. 2001) (holding that a plaintiff must plead such to state a retaliation claim against a former employer based on negative job references).  Rather, based on this single text, Doe speculates "[u]pon information and belief" that "Washington encouraged Representative Jackson Lee to fire Ms. Doe."  Second Am. Compl. ¶ 102.  It is well-settled that such "conclusory allegations supported by information and belief are insufficient to survive a motion to dismiss."  *Niedermeier*, 153 F. Supp. 2d at 31 (citation omitted).

Even accepting Doe's assumption that Washington's reference to "background" in her text message included Doe's then-unpursued legal claims against CBCF and Jones's alleged rape

of Doe, *see* Second Am. Compl. ¶ 50, the text alone does not give rise to liability. The complaint does not allege that Washington actually spoke to Jackson Lee or that their conversation contributed to Doe's termination. Simply put, Doe's complaint suggests nothing more than a "sheer possibility" that CBCF conspired with Jackson Lee's Office to retaliate against her, and that is not enough to survive a motion to dismiss. *Iqbal*, 556 U.S. at 678.

ii.      Joint Employers

Doe also has not adequately pled that CBCF and Jackson Lee's Office are joint employers. For purposes of DCHRA (and Title VII) liability, courts apply the *Browning-Ferris* and *Spirides* tests to determine whether a joint employer relationship exists. *Nytes v. Trustify, Inc.*, 297 F. Supp. 3d 191, 204 (D.D.C. 2018). While the D.C. Circuit has never explicitly adopted one test over the other, "the Circuit is more inclined to adopt the *Browning-Ferris* test when the issue of joint employment arises in the context of . . . employment discrimination claims under the DCHRA and other similar statutes." *Id.* (internal quotation marks omitted); *cf. Redd v. Summers*, 232 F.3d 933, 937 (D.C. Cir. 2000) (suggesting in dictum that *Browning-Ferris* is better suited than *Spirides* for joint-employment discrimination cases).

Under the *Browning-Ferris* test, CBCF would qualify as Doe's joint employer if it "'retained for itself sufficient control of the terms and conditions'" of her employment. *Redd*, 232 F.3d at 938 (quoting *NLRB v. Browning-Ferris Indus., Inc.*, 691 F.2d 1117, 1123 (3d Cir. 1982)). In making this determination, a court must consider:

> "[1] the alleged employer's authority to hire and fire the relevant employees; [2] the alleged employer's authority to promulgate work rules and assignments and to set the employees' conditions of employment: compensation, benefits, and work schedules, including the rate and method of payment; [3] the alleged employer's involvement in day-to-day employee supervision, including employee discipline; and [4] the alleged employer's actual control of employee records, such as payroll, insurance, or taxes."

*Miles v. Howard Univ.*, 83 F. Supp. 3d 105, 117 (D.D.C. 2015) (quoting *In re Enter. Rent-A-Car*

*Wage & Hour Emp't Practices Litig.*, 683 F.3d 462, 469 (3d Cir. 2012)).  These factors do not

comprise an exhaustive list.  *In re. Enter. Rent-A-Car*, 683 F.3d at 469.  Rather, a court's

determination must be "based on a consideration of the total employment situation."  *Id.* (internal

quotation marks omitted).

The *Spirides* test likewise looks to "all of the circumstances surrounding the work

relationship."  *Spirides v. Reinhardt*, 613 F.2d 826, 831 (D.C. Cir. 1979).  The "extent of the

employer's right to control the means and manner of the worker's performance is the most

important factor to review."  *Id.* (internal quotation marks omitted).  But the Court must also

consider:

> (1) the kind of occupation, with reference to whether the work usually is done
> under the direction of a supervisor or is done by a specialist without supervision;
> (2) the skill required in the particular occupation; (3) whether the "employer" or
> the individual in question furnishes the equipment used and the place of work;
> (4) the length of time during which the individual has worked; (5) the method of
> payment, whether by time or by the job; (6) the manner in which the work
> relationship is terminated[,] [i].e., by one or both parties, with or without notice
> and explanation; (7) whether annual leave is afforded; (8) whether the work is an
> integral part of the business of the "employer"; (9) whether the worker
> accumulates retirement benefits; (10) whether the "employer" pays social security
> taxes; and (11) the intention of the parties.

*Id.* at 832.

In short, both tests look to the totality of the circumstances and identify "control" as the

"touchstone" of the joint-employer analysis.  *Al-Saffy v. Vilsack*, 827 F.3d 85, 97 (D.C. Cir.

2016).  While a plaintiff "need not allege every facet of her relationship" with the defendant, she

must still plead facts which, if proven true, would plausibly suggest that a joint-employment

relationship exists.  *Mack v. Aspen of DC, Inc.*, 248 F. Supp. 3d 215, 220 (D.D.C. 2017); *see also*

*Konah v. District of Columbia*, 815 F. Supp. 2d 61, 71 (D.D.C. 2011); *Golden v. Mgmt. &*

*Training Corp.*, 266 F. Supp. 3d 277, 287 n.8 (D.D.C. 2017).

Doe has failed to allege a joint-employer relationship under either the *Browning-Ferris* test or the *Spirides* test. Doe's complaint contains no allegations that CBCF controlled the terms and conditions of Doe's employment. *See Golden*, 266 F. Supp. 3d at 287 n.8. Nor does it suggest that CBCF had any authority to hire, fire, promote, discipline, or supervise Doe. Indeed, the complaint states that it was Jackson Lee who "instructed" Doe to perform certain tasks for the benefit of CBCF. *See, e.g.*, Second Am. Compl. ¶ 43 (Jackson Lee "instructed" Doe to perform certain tasks to benefit CBCF, such as "helping to organize CBCF initiatives and events, drafting and sending letters and emails promoting CBCF events and fundraising efforts, and using Congressional resources to print and transport CBCF materials from the Office to CBCF events"); *see also id.* (alleging that Doe acted "at the direction of Representative Jackson Lee and Mr. Rushing").[4] Without more, work performed for the benefit of another entity does not reasonably imply the existence of a joint-employment relationship. *See Mack*, 248 F. Supp. 3d at 219; *Golden*, 266 F. Supp. 3d at 287 n.8.

Doe argues that "CBCF directed the Office in employment decisions, including directing the Office to fire Ms. Doe and not hire Mr. Jones." Pl.'s Opp'n at 39. But neither of these assertions is supported by the complaint. The former is conclusory and devoid of any factual support. And the latter is refuted by the complaint, which expressly charges Rushing with "decid[ing] not to hire Mr. Jones" because he was aware that Jones had a "situation" with CBCF. Second Am. Compl. ¶ 38. Doe also argues that CBCF was Doe's joint employer because

---

[4] Doe suggests in her opposition brief that CBCF "controlled the work assigned to [Representative Jackson Lee's] Office staff." Pl.'s Opp'n at 39. But the allegations in the complaint do not support her conclusory assertion, and a court cannot consider claims first raised in an opposition brief when deciding a motion to dismiss. *Coll. Sports Council v. Gov't Accountability Office*, 421 F. Supp. 2d 59, 71 n.16 (D.D.C. 2006).

Rushing created a private email address for work related to CBCF.  Pl.'s Opp'n at 39.  But Rushing's decision to create an email address sheds no light on whether CBCF exercised control over Doe, Rushing, or other congressional staffers.  To survive a motion to dismiss, Doe "must provide more detail than she has for the Court to conclude that [CBCF] was her employer for purposes of [DHCRA or] Title VII liability, particularly when she explicitly alleges that another entity—[Jackson Lee's Office]—was her employer."  *Mack*, 248 F. Supp. 3d at 220.

### iii.    Agency

The Court likewise rejects Doe's agency theory.  Under D.C. law, "an agency relationship results when one person authorizes another to act on his or her behalf subject to his or her control, and the other consents to do so."  *Boyd v. Kilpatrick Townsend & Stockton*, 164 A.3d 72, 82 (D.C. 2017) (internal quotations omitted and alterations adopted).  Relevant factors in assessing the existence of an agency relationship include: "(1) the selection and engagement of the servant, (2) the payment of wages, (3) the power to discharge, (4) the power to control the servant's conduct, (5) and whether the work is part of the regular business of the employer."  *Judah v. Reiner*, 744 A.2d 1037, 1040 (D.C. 2000) (internal quotation marks omitted).  Of these, the "determinative" factor is the principal's right to "control and direct" the agent.  *Id.*

Doe has not alleged any facts which, if proven true, would indicate that Jackson Lee acted as CBCF's agent—particularly not with respect to staffing decisions in her own office.  Further, Doe's argument in her opposition brief that CBCF "controlled" Jackson Lee by virtue of her board membership lacks merit.  *See* Pl.'s Opp'n at 37; *see Konah*, 815 F. Supp. 2d at 71 ("[T]he court disregards any additional factual allegations contained within the plaintiff's opposition to [a motion to dismiss].").  Nor does the complaint suggest that Jackson Lee acted in her separate capacity as CBCF's Chair in terminating a member of her personal staff.  Because

the complaint fails to allege that CBCF influenced the decision to terminate Doe or authorized

Jackson Lee to act on CBCF's behalf in making it, the Court will dismiss Doe's DCHRA and

Title VII retaliation claims against CBCF.

2. *Common Law Claims*

In addition to her retaliation claims, Doe claims that CBCF is liable for a pair of

common-law torts. She first alleges that Washington tortiously interfered with Doe's contractual

rights, business relationships, and prospective economic advantages by disclosing Doe's legal

claims against CBCF to Jackson Lee. *See* Second Am. Compl. ¶¶ 98–104. Second, Doe

contends that CBCF urged Jackson Lee to "fire Ms. Doe . . . to inflict emotional distress on

[her]." *Id.* ¶ 106. The Court concludes that Doe has not pled sufficient facts to plausibly

establish either of these tort claims against CBCF.

i. Tortious Interference

To state a tortious interference claim, Doe "must plead (1) the existence of a valid

business relationship or expectancy, (2) knowledge of the relationship or expectancy on the part

of the interferer, (3) intentional interference inducing or causing a breach or termination of the

relationship or expectancy, and (4) resultant damage." *Browning v. Clinton*, 292 F.3d 235, 242

(D.C. Cir. 2002) (internal quotation marks omitted). Doe also "bears the burden" of establishing

a "substantial and direct causal link" between the alleged interference and the damages

suffered—that is, her termination from Jackson Lee's Office. *Newmyer v. Sidwell Friends Sch.*,

128 A.3d 1023, 1039 (D.C. 2015) (internal quotation marks omitted).

Doe's complaint fails to plausibly allege that CBCF intended to interfere with Doe's

employment. To support a claim of tortious interference, a plaintiff must allege more than a

"general intent to interfere or knowledge that the conduct will injure the plaintiff's business

dealings." *Sheppard v. Dickstein, Shapiro, Morin & Oshinsky*, 59 F. Supp. 2d 27, 34 (D.D.C. 1999) (noting that a plaintiff must make "a strong showing of intent to disrupt ongoing business relations"). The complaint includes nothing more than a conclusory statement that "Washington disclosed Ms. Doe's legal claims against CBCF to Representative Jackson Lee with the intent to sever any ties between Representative Jackson Lee and Ms. Doe." Second Am. Compl. ¶ 101. This "naked assertion[] devoid of further factual enhancement" does not suffice. *Aschcroft*, 556 U.S. at 678 (internal quotation marks omitted). Even assuming that the "background" text referred to Doe's alleged rape and unresolved legal claims, and that Washington did at some point relay this information to Jackson Lee, Doe has not pled any facts which plausibly suggest that he communicated this information with the intent to disrupt Doe's employment.[5] Doe's tortious interference claim will therefore be dismissed.

ii.     Intentional Infliction of Emotional Distress

"To state an IIED claim, a plaintiff must plead facts showing (1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Grimes v. District of Columbia*, 89 A.3d 107, 113 (D.C. 2014) (internal quotation marks omitted). "Liability will be imposed only for conduct so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 113–14 (internal quotation marks omitted). The D.C. courts have been "particularly demanding as to the proof required to support a claim of [IIED] in an employment context." *Paul v. Howard Univ.*, 754

---

[5] Doe also likely fails to establish that CBCF caused her termination because she has not shown "a "substantial and direct causal link" occurred between the "background" text and her ultimate termination, which occurred four months later. *See Newmyer*, 128 A.3d at 1039; *see McIntyre*, 460 F. Supp. 2d at 133 ("This Court has often followed a three-month rule to establish causation on the basis of temporal proximity alone.").

A.2d 297, 307 (D.C. 2000); *see Asare v. LM-DC Hotel, LLC*, 62 F. Supp. 3d 30, 35 (D.D.C. 2014).

Doe has not alleged extreme or outrageous conduct that might meet this "exacting" standard. *Williams v. District of Columbia*, 9 A.3d 484, 494 (D.C. 2010). The only potentially relevant allegation in the complaint is that Washington sent a facially neutral text message to Jackson Lee offering to provide "background" on her. Even accepting the inference that this was a "reference to the fact that Ms. Doe had asserted legal claims against CBCF and the fact that Mr. Jones had raped Ms. Doe," Second Am. Compl. ¶ 50, sharing this information with Jackson Lee current employer did not "go beyond all possible bounds of decency," *Grimes*, 89 A.3d at 114, or "rise to the level of outrageous behavior required to support a claim for [IIED]," *Williams v. Fannie Mae*, 2006 U.S. Dist. LEXIS 42911 at *31–33 (D.D.C. June 26, 2006) *Kerrigan v. Britches of Georgetowne*, 705 A.2d 624, 628 (D.C. 1997) (dismissing IIED claim even though defendant allegedly: "[1] targeted him for a sexual harassment investigation, [2] manufactured evidence against him in order to establish a false claim of sexual harassment, [3] leaked information from the investigation to other employees, and [4] unjustifiably demoted him to the position of store manager in order to promote a woman to his position"); *Grimes*, 89 A.3d at 114 (dismissing IIED claim in which an employer allegedly "investigated [plaintiff], wrote a false report, and published that report to others" in retaliation for seeking disability benefits); *Williams v. District of Columbia*, 9 A.3d at 487–88, 494 (dismissing IIED claim that an employer terminated plaintiff for reporting misconduct and then spread false reports that he was terminated for embezzlement instead).

To support her IIED claim, Doe principally relies on *King v. Kidd*, 640 A.2d 656 (D.C. 1993), but her single allegation of wrongdoing does not resemble the sustained pattern of

discriminatory conduct at issue in *King*. There, an employer secretly discussed the plaintiff's sexual harassment claims against a coworker with that coworker and then refused to meet with the plaintiff to address them. *Id*. at 672. And over the course of a year, the employer engaged in a pattern of discriminatory conduct by rebuffing the plaintiff's five or six attempts to set up a meeting; reneging on a promise to hold a hearing; issuing a response to the grievance outside of the prescribed window; and failing to inform the plaintiff of her right to appeal. *Id.* at 671–72. Then, after the plaintiff filed a formal complaint, the employer "took active steps to help [the alleged harasser] defeat" the complaint; helped the harasser transfer the plaintiff against her will; "withdrew [the plaintiff's] eligibility for a promotion;" asked the plaintiff to sign a statement that would in effect absolve [the harasser] from any foul play;" and denied the plaintiff a promotion by falsely claiming she had been transferred "at her own request." *Id.* at 672–74.

Doe's claim that CBCF "encouraged Representative Jackson Lee to fire Ms. Doe . . . to inflict emotional distress on [her] so that she would not pursue her legal claims against CBCF," Second Am. Compl. ¶ 106, falls well short of the pattern of discriminatory conduct in *King*, and it is unsupported by fact-based allegations. Accordingly, the Court will dismiss Doe's IIED claim.

**CONCLUSION**

For the foregoing reasons, the Court grants CBCF's Motion to Dismiss the Amended Complaint; its Motion to Dismiss the Second Amended Complaint; and the Office of Representative Sheila Jackson Lee's Motion to Dismiss the Amended Complaint. A separate order accompanies this memorandum opinion.

DABNEY L. FRIEDRICH
United States District Judge

February 14, 2020